# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

---

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

August 13, 2025

***By Email & CM/ECF***
The Honorable Analisa Torres
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   ***United States v. Frank Alicea***
      **25 Cr. 184 (AT)**

Dear Judge Torres,

The Court should sentence Frank Alicea to a term of imprisonment of one day on Count 1 and the statutory minimum 60 months' imprisonment on Count 2, to be followed by three years' supervised release with special conditions requiring Mr. Alicea to spend the first six months of supervision in a federal residential reentry center and to participate in outpatient mental health and substance abuse treatment.

Mr. Alicea is a lifelong Spanish Harlemite who has never lived (nor traveled) anywhere else. He also has an extraordinarily traumatic personal history. Neglected as a child and adolescent, Mr. Alicea was exposed to extreme violence and drug use from an early age, which contributed heavily to his own addiction to drugs (namely ecstasy and MDMA) and substantial cognitive impairments. Although he and his mother have reconciled despite their tumultuous past, it is indisputable that Mr. Alicea has had to navigate life alone, without any real support.

Mr. Alicea knows he has nobody to blame but himself for the terrible decision-making that culminated in this case. Nevertheless, Mr. Alicea's choices must be understood in context. Mr. Alicea readily admits that he sold drugs and two guns to a person he knew well and cared about, and who turned out to be a confidential human source. But Mr. Alicea did not act out of greed. He sold drugs to sustain his own habit, and he essentially middle-manned the sale of two guns to a confidential source because he convinced Mr. Alicea that he needed them for his own protection. Indeed, Mr. Alicea would have never possessed—let alone sold—any firearms to anyone had it not been for his relationship with the informant and the immense pressure he put on Mr. Alicea to help him obtain a gun. Mr. Alicea knew

the confidential informant for many years, since the informant was an adolescent, and Mr. Alicea grew to love him as his own family. Feeling obligated to the informant, who repeatedly and persistently asked Mr. Alicea to help him buy guns, Mr. Alicea capitulated to the source's beseeching and made one of the worst mistakes of his life.

Mr. Alicea does not have a gun-related record or a history of dealing with firearms, and he suffers from deficits and drug abuse-related mental impairments that make him particularly susceptible to impulsive decision-making, peer pressure, and manipulation. Coupled with the substantial progress Mr. Alicea has made since his detention at MDC Brooklyn and his affirmative request to spend the first six months of his supervised release in a carceral, halfway house setting, the totality of Mr. Alicea's personal background and record weighs against imposing a term of imprisonment greater than the five years required by Count 2.

***Mr. Alicea's traumatic history includes parental neglect; emotional, physical, and mental abuse; premature exposure to violence, drugs, and sex; and extreme substance use disorder.***

Frank Alicea was born at Metropolitan Hospital on November 18, 1976. His mother, Livia Gonzalez, was only 14 years old when she had him. His father, Frank Alicea Sr., was brutally murdered when Frank was nearly two years old. Police found Mr. Alicea's father's chopped-up body in an incinerator located within Harlem's Carver Projects.

The odds have been stacked against Mr. Alicea since he was a child. His mother struggled to properly care for him and his younger brother, Anthony. They lived in Spanish Harlem's public housing, which was a hotspot for drug dealing, violence, and overdoses. Livia suffered from a crack cocaine addiction and would abandon Mr. Alicea and his brother for days at a time with no explanation or care. When Livia would disappear, the boys sought refuge with their grandmothers, who lived a few blocks away in the same neighborhood.

Although Mr. Alicea's grandmothers helped shelter and feed him, they were poorly situated to provide him with a stable and structured home environment. Both grandmothers were alcoholics who lived with their alcoholic sons. Mr. Alicea's maternal uncles would get blackout drunk and fight each other with knives, screaming obscenities at each other and sometimes bleeding out in front of the kids. When Mr. Alicea's uncles engaged with him or tried to teach him anything, they emphasized that toughness and street credibility were the most important things in life, not an education or a career. All of them were in and out of jails and prisons.

One day, when Mr. Alicea was about 11 years old, he saw the first of many dead bodies he would encounter in his life: one of his uncles, the closest thing to a father figure Mr. Alicea ever had, shot himself in the head in the middle of his apartment, for all his family to see.

The terrible paradox of Mr. Alicea's childhood and adolescence is that, while he hated it when his mother disappeared, having her around was not much better. Livia was rarely sober and never "there" mentally. She was constantly interacting with drug dealers who tried to exploit and cheat her. If Livia failed to pay them, the dealers would physically assault her, often right in front of Mr. Alicea. Mr. Alicea was ten years old the first time he fought a grown man to protect his mother. And in addition to fraternizing with drug dealers, Livia also dated abusive men. For years, Mr. Alicea struggled to understand why his mother consistently chose vile and violent men over him and his siblings.

As Mr. Alicea grew up, he would sometimes catch his own friends from the neighborhood selling drugs to his mom, and he would try to fight them too. Without even realizing it, and barely 11 years old, Mr. Alicea developed a reputation on the street as a tough guy, and the wrong people started paying more attention to him. Eventually, older drug dealers recruited Mr. Alicea and offered him something he had never experienced before: a sense of belonging. In Mr. Alicea's old neighborhood, the people with the most respect were drug dealers, and the gangs that they comprised operated like families. In fact, in Mr. Alicea's neighborhood, drug dealers were the only examples of success available for Mr. Alicea to emulate.

Drug dealing also helped Mr. Alicea make a little money for the first time in his life. Before Mr. Alicea began dealing drugs, no one provided him with necessities, like food and clothes and shoes. He had to scrounge for those items. But once he started dealing, he was able to buy those things for himself and his little brother. Mr. Alicea was only 12 when the older kids on the block began involving him more heavily in their operations. Although this made Mr. Alicea significantly less safe, he at least felt like he had a family that cared for him.

Although Mr. Alicea relied on his fists for protection, gun violence was rampant in his neighborhood. When Mr. Alicea was 15, someone shot his best friend in the face with a shotgun and killed him. With all of this going on, Mr. Alicea was not going to school much and he fell far behind, remaining essentially illiterate throughout his teenage years. As a result, Mr. Alicea had zero motivation to learn. He hated being called on in class because he could not read and was frequently called stupid by teachers and peers alike. Against this backdrop, Mr. Alicea began skipping school regularly.

3

Mr. Alicea was only 11 when he drank alcohol for the first time, and he began smoking marijuana shortly thereafter. As he entered his teenage years, Mr. Alicea became increasingly reliant on substances to get by. Ironically, while Mr. Alicea's drug addiction worsened as he grew older, Livia began working on her sobriety and found a new boyfriend.

Sadly, Livia's sobriety marked another turning point in their relationship. Her overall demeanor towards Mr. Alicea and his brother changed, as she felt that their bad habits—which she played a substantial role in fostering—dragged her down. Livia eventually kicked her sons out of her house and began focusing on starting a family with her new boyfriend. Feeling more abandoned than ever, Mr. Alicea completely dropped out of school and began spending all his time on the streets.

Soon enough, Mr. Alicea was regularly drinking entire bottles of liquor on his own and taking ecstasy pills multiple times a day. While marijuana and ecstasy were his drugs of choice, he tried an array of other controlled substances, including powerful psychedelics like psilocybin (mushrooms) and LSD (acid). Drinking and getting high were the only things that helped Mr. Alicea make it through the day. While the drugs dulled his pain, they also heavily contributed to him making terrible choices, resulting in his first arrest and imprisonment at 14 years old.

After Mr. Alicea's first incarceration, he became trapped in a cycle of addiction, struggling to obtain employment and keep a roof over his head. He dealt drugs to sustain his habit and himself, as it was extremely difficult for him to find a job given his illiteracy and lack of education. Fortunately, Mr. Alicea taught himself how to read and write during one of his state incarcerations later in his adulthood, which helped him obtain low-skill construction and custodial jobs. But generally, Mr. Alicea lacked the family and social support to start fresh and build a meaningful life for himself, as his mother prioritized her new family and younger children, consistently viewing Mr. Alicea as a burden and liability.

Life on the streets has come with a heavy price for Mr. Alicea, as he has been the victim of violence throughout his adult life. He has been stabbed, shot, and slashed across the back of his neck. In 2002, he and four friends were walking and were shot at from behind. After four bullets hit his friend, Mr. Alicea stayed back to help him, only to get shot as well. Mr. Alicea's friend miraculously survived the shooting, and he credits Mr. Alicea with saving his life.

4

In 2014, when Mr. Alicea was around 37 years old, his best friend was murdered. When Mr. Alicea heard the news, he completely decompensated and went on an extreme bender with drugs and alcohol. He was imprisoned shortly thereafter for a parole violation. His best friend's murder is something that Mr. Alicea still has not recovered from emotionally.

Mr. Alicea has had very few romantic relationships and does not have any children of his own. A few years after his best friend was killed, Mr. Alicea became romantically involved with a woman who had three children, and he moved in with them. At first, the experience felt transformative; for the first time in his life, Mr. Alicea felt loved and respected, and he cherished his relationship with the children. Being a father figure to them felt fulfilling and Mr. Alicea enjoyed feeling useful. Sadly, however, it became clear that the woman was taking advantage of Mr. Alicea. When her children's real father returned from prison, she unceremoniously kicked Mr. Alicea out of her house with hardly an explanation.

After this happened, Mr. Alicea tried to deal with his emotional turmoil productively, obtaining a job as a maintenance worker at a Marriott hotel. This was one of the only real jobs Mr. Alicea has ever had, and he enjoyed providing for himself legitimately. He felt that he was on the right path. It was against this backdrop that he reconnected with the confidential informant and made the worst mistake of his life.

***Mr. Alicea's offense conduct is inextricably intertwined with his substance use disorder and traumatic personal background, factors that have stunted his cognitive development and capacity, leaving him especially vulnerable to poor decision-making and emotional manipulation.***

One day, someone that Mr. Alicea had known since the person was a boy began messaging him on Instagram. The young man implored Mr. Alicea to help him buy drugs and a gun. Mr. Alicea proceeded to sell small amounts of cocaine, cocaine base, and ecstasy to the informant on numerous occasions. Mr. Alicea knows this conduct was illegal and wrong, even if he was primarily motivated by his own drug habit. Moreover, despite law enforcement arranging drug sales with Mr. Alicea for over a year, Mr. Alicea's sales were small-time; he sold hand-to-hand quantities to the informant on every occasion.

The request for a gun was different. Mr. Alicea initially resisted; he had never sold guns before and knew from personal experience how dangerous and scary they are. However, the young man (now understood to be the confidential informant), persisted and continued to press Mr. Alicea for help buying a gun,

5

crying and begging for his help. He told Mr. Alicea that he was scared for his life and that he needed weapons for his protection. Mr. Alicea felt sincerely torn. He knew that helping this young man get a gun was wrong and that it could get him in serious trouble. But Mr. Alicea also believed the young man's fear and saw his situation as dire. He did not want to let this young man down and genuinely believed that he was relying on Mr. Alicea because he had nobody else. Mr. Alicea finally relented and agreed to help him obtain a firearm.

Because Mr. Alicea did not have ready access to guns, to obtain the two weapons that he sold to the confidential informant, he had to effectively sell them to the informant on behalf of a third party. For example, as set forth in the Complaint, when the confidential informant performed a controlled purchase of drugs and a gun from Mr. Alicea on February 13, 2023, Mr. Alicea did not have the firearm on him initially. Rather, after selling the informant a small amount of crack cocaine, Mr. Alicea told the informant he would have to return later to get the firearm. When they reconvened, the confidential informant gave Mr. Alicea $900, which he immediately used to buy the gun from inside of an apartment building while the confidential informant waited outside.

Mr. Alicea readily admits that he should have never sold the confidential informant drugs or guns, and he also readily acknowledges that he has been selling drugs throughout his life to sustain his own habits and support himself. However, Mr. Alicea had never sold firearms before and essentially served as an intermediary to help a persistent confidential informant obtain weapons that he insisted were necessary to protect himself. Mr. Alicea would not have relented but for the informant's emotional coercion.

In connection with plea negotiations, I retained Dr. Edward Fernandez to evaluate Mr. Alicea and interview his family and friends. As set forth in Dr. Fernandez's report, enclosed as Attachment A, Mr. Alicea's verbal and non-verbal reasoning abilities are in the "extremely low range" and above those of only .1% and .3% of his peers, respectively. His ability to sustain attention, concentrate, and exert mental control is also in the "extremely low range," resulting in a performance better than approximately 1% of his peers. Mr. Alicea's weakness in mental control and his extremely low scoring are concrete examples of his diminished intellectual functioning and "severe impairments" in his abstract thinking and judgment. These factors play a crucial role in understanding his offense conduct and his susceptibility to the pressure he felt from the confidential informant to obtain firearms. As Dr. Fernandez concludes:

In regard to his instant offense, Mr. Alicea's lowered cognitive functions preclude his ability to utilize appropriate social judgment. He has limited social supports aside from his immediate family; however, those relationships are also strained. The relationships he did have in the community were characterized by him and [his mother,] Ms. Gonzalez as having a negative impact on his decision making. Taken together with his clinical presentation, intellectual functioning and history (i.e., special education), Mr. Alicea appears to have symptoms associated with a cognitive impairment. His lowered abilities can contribute to an impairment in appreciating the nature and impact of his behavior, which can also make a person more vulnerable to manipulation and coercion. For example, as previously described by Mr. Alicea and Ms. Gonzalez regarding his environment and associates, lowered cognitive abilities can contribute to having difficulty understanding other's motives and not fully comprehending the implications of their behavior. Mr. Alicea presents as genuinely wanting acceptance and validation, however, has received this from negative peer influences within his environment.

Attachment A at 12. Indeed, Mr. Alicea's "general overall extremely low performance in all cognitive domains" suggests that it is normal for him to "become strained when presented [with] new or complicated information, leading to dissociation, frustration and lack of comprehension." *Id.*

Against this backdrop, a sentence much greater than the mandatory minimum 60 months' imprisonment on Count 2 would be greater than necessary to achieve the statutory goals of sentencing. This is particularly true given the irrationality of the drug guidelines driving the recommended sentence on Count 1 and the tremendous strides Mr. Alicea has made while detained at MDC Brooklyn to maintain sobriety and set himself up for a better, more stable life upon release.

***A combined sentence of five years and a day in prison sufficiently balances the need to punish Mr. Alicea and promote respect for the law with his personal background and record, and the need to afford him access to necessary medical care and vocational training.***

There are five principal reasons justifying a variance below the stipulated guidelines range to a combined sentence of five years and one day imprisonment on Counts One and Two.

***First***, Mr. Alicea's personal background and record, and the unusual circumstances of the offense, weigh in favor of a variance. Mr. Alicea has led an extremely difficult life and was deprived of the love, support, and companionship that many people take for granted. Mr. Alicea's traumatic personal history and his longstanding substance abuse disorder exacerbated cognitive deficiencies and impairments that made him uniquely susceptible to the pressure he felt from the confidential informant to obtain guns. Dr. Fernandez's uncontroverted diagnoses and sobering assessments of Mr. Alicea's critical thinking skills plainly mitigate Mr. Alicea's culpability and provide assurances that, through rigorous federal supervision, mental healthcare, and substance abuse treatment, the risk of recidivism is low.

***Second***, and notwithstanding the terrible conditions of confinement that Mr. Alicea has been forced to endure since his arrest and remand nearly two years ago, Mr. Alicea has spent his time at MDC Brooklyn productively. Mr. Alicea has not only maintained sobriety for the duration of his detention—the longest period of sobriety he has enjoyed in his adult life—and avoided incurring any disciplinary infractions, but he has also worked hard in the kitchen as a dishwasher, earning extraordinary accolades and praise from his supervisor. Indeed, and as set forth in the attached work performance evaluation from this past January (Attachment B), Mr. Alicea is a "very hard-working person" who is "very responsible, reliable and focused." Mr. Alicea regularly displays "exceptional work ethics with the team to feed the inmate population of over thirteen hundred especially when things break down and extra work is needed." Mr. Alicea has been "an all-round great worker who takes initiative and gets along well with both staff and inmates." And in addition to his outstanding work in the kitchen, which has been challenging and time-consuming, Mr. Alicea has also taken courses designed to promote his positive reintegration into society, including a commercial driver's license course. *See* MDC Brooklyn Programmatic Certifications (Attachment C).

Of course, even without Mr. Alicea's significant personal and professional accomplishments at MDC Brooklyn, the conditions of Mr. Alicea's pretrial detention have imposed an additional, significant punishment that is not reflected in the calculation of his guidelines range but weighs in favor of a downward variance.

As Judge Berman has noted, MDC Brooklyn has long been "dirty" and "infested with drugs," with a prevalence of "violence." *United States v. Moran*, 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), Doc. 90, Tr. 12:25-15:21, 37:15-18. Judge McMahon described the conditions there "as disgusting [and as] inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that." *United States v. Days*, 19 Cr. 619 (CM) (S.D.N.Y.

Apr. 29, 2021), Doc. 35, Tr. 19:17-20. These conditions have deteriorated over the past few years, with multiple individuals having been killed or dying. *See, e.g.*, L. Fadulu, N.Y. TIMES, "Inmate Dies After Fight Breaks Out at Troubled Brooklyn Jail" (July 17, 2024).[1]

In an opinion issued shortly after Mr. Alicea arrived MDC Brooklyn, Judge Furman described in detail how the "dreadful" conditions there impact the lives of those unfortunate enough to be housed there. *United States v. Chavez*, 710 F. Supp. 3d 227 (S.D.N.Y. 2024). "First, inmates at the MDC spend an inordinate amount of time on 'lockdown'—that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise." *Id.* at 233.

"Second," Judge Furman found that "MDC is notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates," and that "[i]t has become common for defense counsel to require court intervention to ensure that inmates receive basic care — and, even more shocking, not uncommon for court orders to go unheeded." *Chavez*, 710 F. Supp. 3d at 234.

Third, Judge Furman noted that "the MDC's physical conditions have long been problematic," and described how other litigations had found "visible mold on walls and ceilings, contaminated drinking water, vermin infestation, mouse droppings falling through HVAC vents, and roaches and flies in showers." *Chavez*, 710 F. Supp. 3d at 235.

As Judge Furman wrote, there have been severe staffing shortages at the MDC for years." *Chavez*, 710 F. Supp. 3d at 229 (noting that "as of November 2023, *the MDC was operating at only about 55% of its full correctional officer staffing level*" (emphasis in original)). As Judge Furman further noted:

> A recent memo by Rhonda Barnwell, the president of the union local representing the MDC's correctional officers, helps explain why the MDC's staffing shortage translates directly into its inhumane conditions of confinement. *See United States v. Irizarry*, 23 Cr. 60 (JMF), Doc. 47-3 (S.D.N.Y. Oct. 30, 2023). According to her memo, "[o]n a daily basis housing units . . . are left . . . unmanned by staff[ ] and locked down, with the expectation . . . that a single [ ] Officer is to make rounds, feed, and perform additional correctional duties" on

---

[1]    https://www.nytimes.com/2024/07/17/nyregion/inmate-dies-metropolitan-detention-center.html (last visited Aug. 13, 2025).

three units during a single shift. *Id.* at 12. The frequency of lockdowns "angers the inmates and heightens the inherent danger for staff," but "[c]overage is so minimal that at times there are only 6 staff members available to respond to body alarms, staff assists, and[/]or inmate medical emergencies." *Id.* at 2.

*Chavez*, 710 F. Supp. 3d at 236, n.16.

Eight months after *Chavez*, Judge Brown reiterated how "dangerous, barbaric conditions . . . have existed for some time at the Metropolitan Detention Center in Brooklyn." *United States v. Colluci*, 12 Cr. 417 (GRB), 2024 WL 3643857, at *1 (E.D.N.Y. Aug. 5, 2024). Judge Brown summarized how judges in the Southern and Eastern Districts of New York frequently lower, reduce, or don't impose sentences of incarceration based on the conditions at MDC, including "inadequate supervision, unbridled assaults[,] and lack of sufficient medical care." *Id.* at *3.

The Government is likely to argue that conditions at MDC Brooklyn have improved recently and that the sentence reductions granted by courts in this Circuit to account for these conditions are no longer warranted. This is, sadly, not true. MDC remains on lockdown for prolonged periods of time due to institutional staffing and safety issues. *See, e.g.*, Notice to the Inmate Population (Feb. 22, 2025) (Attachment D). For example, for several weeks from late February to early March, the facility was locked down after a "brawl" that the Government has described as involving multiple individuals "armed with weapons," "chasing and stabbing" one victim 18 times, requiring hospitalization for his injuries, necessitating trips to the hospital for four other inmates, and medical treatment needed for more than 20 other inmates. *See* U.S. Att'y's Office, Eastern District of New York, "25 Metropolitan Detention Center Inmates, Their Associates and a Former Correctional Officer—Charged in a Dozen Criminal Cases at the Federal Jail in Brooklyn," (March 6, 2025).[2] Shortly thereafter, the Government announced "criminal charges against 25 defendants in 12 separate cases relating to violence and contraband smuggling," including "against 15 inmates for violent assaults against other inmates from May 2024 to the present; a former correctional officer for attempting to smuggle contraband into the facility on January 21, 2025; an inmate for orchestrating a contraband smuggling operation between April and June 2024; an inmate for smuggling ceramic scalpels into the facility on October 12, 2024; an inmate for possession of contraband and continuing to commit fraud while detained at MDC-Brooklyn; and an MS-13 gang associate for attempting to smuggle

---

[2] https://www.justice.gov/usao-edny/pr/25-metropolitan-detention-center-inmates-their-associates-and-former-correctional

a large package of contraband, including 18 cellphones and marijuana, to other MS-13 gang members incarcerated at MDC-Brooklyn"—all of this after nine inmates were previously charged with violence and contraband offenses in September 2024 and after a "week-long multi-agency operation aimed at detecting and seized contraband from MDC-Brooklyn" in October 2024. *Id.* Clearly, the efforts of the BOP and other government agencies to improve the horrid conditions at MDC Brooklyn have not had an appreciable impact, and the detainees like Mr. Alicea who are unlucky enough to be housed there deserve recognition of these harsh conditions when courts sentence them. Moreover, even if the Court were to credit the government's claims of recent "improvements," it would not change the fact that Mr. Alicea has been incarcerated at MDC since October 2023—months *before* Judge Furman authored the *Chavez* opinion. Mr. Alicea's term at MDC has been as difficult as any other the Court has seen.

Accordingly, as many courts in this District have done, the Court should take into consideration that the excessively harsh conditions of Mr. Alicea's confinement have made every day he has served more punishing than it should be and downwardly vary in imposing sentence. *See, e.g.*, *United States v. Phillibert*, 15 Cr. 647 (PAE), 2021 WL 3855894, at *4 (S.D.N.Y. Aug. 27, 2021) ("Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually arduous conditions merited recognition by courts in measuring a just sentence." (citing, *inter alia*, *United States v. Carty*, 264 F.3d 191, 196-97 (2d Cir. 2001)). As Judge Brown described, "the present conditions at MDC make [time served there] materially different than [time] served at a jail or prison elsewhere in the United States that is appropriately managed." *Colucci*, 2024 WL 3643857, at *7. Mr. Alicea's sentence should reflect the disproportionate punishment he has already received.

***Third***, the Court should not give the stipulated guidelines range on Count 1 any deference because the numbers are irrational and treat Mr. Alicea more harshly simply because he mostly sold the confidential informant cocaine base ("crack cocaine"). Mr. Alicea's base offense level of 24 for Count 1 is predicated on the total "converted drug weight" calculation under U.S.S.G. §§ 2D1.1(a) and 2D1.1(c)(5), which treats a person convicted of distributing 5,000 grams of cocaine the same as a person convicted of selling 280 grams of crack cocaine. This 18:1 ratio is a vestige of the barbaric 100:1 ratio that predated the 2010 Fair Sentencing Act and continues to drive unwarranted, harsh sentencing disparities between crack and powder cocaine defendants.

Unlike most guidelines, §2D1.1 is based on neither empirical data nor technical expertise. Instead, it is purely a quantity-based model, divorced from science and reason. *See Spears v. United States*, 555 U.S. 261, 265-266 (2009) ("[W]e

now clarify that district courts are entitled to reject and vary categorically from the crack cocaine Guidelines based on a policy disagreement with those Guidelines"); *United States v. Diaz*, 11 Cr. 821 (JG) 2013 WL 3222243, at *1 (E.D.N.Y. Jan 28, 2013) (discussing the flaws in the drug guideline at length and determining to accord the high ranges it produces "very little weight"), cited with approval in *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir 2013).

Since 1995, the Sentencing Commission has recommended that the disparity between crack and powder cocaine be eliminated completely. On June 22, 2021, the Department of Justice joined that call and urged Congress to eliminate the disparity and pass the "Eliminating a Quantifiably Unjust Application of the Law Act" (also known as the "EQUAL Act").[3] On September 28, 2021, the House of Representatives passed the EQUAL Act by a vote of 361 to 66, with nearly 70% of the GOP and 100% of the Democrats voting in favor of ending the crack/powder imbalance.

The DOJ presented Congress with three main arguments for why crack and powder cocaine should not be treated differently. DOJ Statement at 6. First, the disparity "is simply not supported by science, as there are no significant pharmacological differences between the drugs: they are two forms of the same drug, with powder readily convertible into crack cocaine." *Id.* Second, "as documented by the Sentencing Commission, the crack/powder sentencing differential is still responsible for unwarranted racial disparities in sentencing."[4] *Id.* Third, "the higher penalties for crack cocaine offenses are not necessary to achieve (and actually undermine) our law enforcement priorities…." *Id.*

Of course, the EQUAL Act has not yet passed. But that has not stopped courts from abandoning the 18:1 ratio in favor of equality. The growing tide of courts resorting to a 1:1 ratio in sentencing crack cocaine cases provides even more support for the Court to view the guidelines range in this case with deep skepticism. *See, e.g., United States v. Gardner*, 20 F. Supp. 3d 468 (S.D.N.Y. 2014) (applying a 1:1 ratio rather than the 18:1 ratio of crack to powder cocaine in calculating minimum sentences under Sentencing Guidelines for defendants' convictions for drug offenses involving at least 3.6 kilograms of crack cocaine, and treating the quantity of crack cocaine attributed to the defendants as if it were the equivalent quantity of powder cocaine under the Guidelines); *United States v. Whigham,* 754 F. Supp. 2d 239, 246 (D. Mass. 2010) ("I will apply a 1:1 ratio for all crack cocaine

---

[3] Available at: https://www.justice.gov/criminal/media/1366586/dl?inline.
[4] For example, a 2017 Sentencing Commission report on "Demographic Differences in Sentencing" found that Black male offenders received sentences on average 19.1% longer than similarly situated white male offenders during the fiscal years 2012 through 2016.

sentencings"); *United States v. Williams*, 788 F. Supp. 2d 847, 891-92 (N.D. Iowa 2011) ("I must reject the Sentencing Guidelines using the 'new' 18:1 ratio, just as I rejected the Sentencing Guidelines using the 'old' 100:1 ratio, based on a policy disagreement with those guidelines, even in "mine-run" cases, such as this one. I must do so, because I find that the 'new' 18:1 guidelines still suffer from most or all of the same injustices that plagued the 100:1 guidelines, including the failure of the Sentencing Commission to exercise its characteristic institutional role in developing the guidelines, the lack of support for most of the assumptions that crack cocaine involves greater harms than powder cocaine, the improper use of the quantity ratio as a 'proxy' for the perceived greater harms of crack cocaine, and the disparate impact of the ratio on black offenders.").

**Fourth**, Mr. Alicea clearly requires long-term psychological and substance abuse treatment in the community, where he can build a support group and receive trauma-focused care, including cognitive behavioral therapy. He is unlikely to receive any of this in prison. 18 U.S.C. § 3553(a)(2)(D).[5] Indeed, the BOP's health service units are grossly understaffed and are not well-positioned to assist Mr. Young. *See, e.g., Dep't of Justice Federal Prison System Fiscal Year 2019 Performance Budget*, at p. 7 (projecting BOP to operate at 16% over its rated capacity).

For example, in March 2016, the Department of Justice's Office of the Inspector General released a comprehensive review of BOP's "medical staffing challenges," describing the situation in at least some facilities as a "crisis." *See Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, (Mar. 2016).[6] And within these severely overcrowded, understaffed prisons, roughly 44% of male inmates suffer from mental health problems. *See* DOJ, Bureau of Justice Statistics, *Mental Health Problems of Prison and Jail Inmates*, p. 4, Table 3 (Sept. 2006).[7] And yet, a very small percentage of these individuals ever receive professional mental health treatment. *See id.*, p. 3 (Table 1) & p. 9 (Table 14). *See also, e.g.*, Christie Thompson and Taylor Elizabeth Eldridge, *Treatment Denied: The Mental Health Crisis in Federal Prisons*, The Marshall Project (Nov. 21, 2018, 6:00 a.m. ET).[8] The Court cannot be assured that Mr. Alicea will have access to the therapy and

---

[5] This is particularly true given the fact that Mr. Alicea's conviction under 18 U.S.C. § 924(c)(1)(A)(i) will preclude him from participating in BOP's Residential Drug Abuse Program. It will also interfere with his ability to participate in other BOP drug treatment programs and deprive him of First Step Act credits and sentence reductions.

[6] Available at https://oig.justice.gov/reports/2016/e1602.pdf

[7] Available at: https://www.bjs.gov/content/pub/pdf/mhppji.pdf

[8] Available at: https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons

counseling he needs while in BOP custody, but it certainly can as soon as Mr. Alicea begins supervised release.

      *Fifth*, the government will undoubtedly highlight general deterrence, and specifically the dangers of drug dealing, to justify a sentence greater than the minimum 60 months Mr. Alicea faces on Count 2. But sentencing Mr. Alicea to a prison term longer than required by statute will not promote general deterrence or have any impact on the drug crisis. Research consistently shows that neither increased arrests nor increased severity of criminal punishment for drug law violations has any effect on drug supply or demand. In other words, punitive sentences for drug offenses have no deterrent effect. *An Overdose Death Is Not Murder: Why Drug-Induced Homicide Laws Are Counterproductive and Inhumane* at 2, Drug Policy Alliance (Nov. 2017), https://drugpolicy.org/sites/default/files/dpa_drug_induced_homicide_report_0.pdf.

      Rather, to achieve the aim of general deterrence, "social science conclusively finds that certainty matters more than severity." Brian Jacobs, *The Cost of Affording Deterrence*, Forbes (Nov. 16, 2021), https://www.forbes.com/sites/insider/2021/11/16/the-cost-of-affording-deterrence/?sh=6f8975277bd4 (hereinafter "Jacobs Report"). "[T]he vast majority of people who are committing crime are not particularly forward-looking. So adding five or ten years to an already long prison sentence simply doesn't have much of an effect on their behavior today." *Id.* In a bulletin by the National Institute of Justice, the U.S. Department of Justice echoes, "Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment." U.S. Department of Justice, *Five Things About Deterrence* 1, National Institute of Justice (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf. "Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes." *Id.*

      To combat the drug crisis and promote general deterrence, it therefore follows that courts should focus on supervised release, which "comes with an increased likelihood that reoffenders will be caught, thereby providing the increased certainty of punishment that is more likely to result in specific deterrence to individuals on supervised release, and potentially general deterrence as well at least to those who may associate with individuals on supervised release." Jacobs Report at 1. That rationale applies with particular force to Mr. Alicea, who would face a substantial period of incarceration were he to engage in any new criminal conduct or relapse into drug use while on supervised release.

Mr. Alicea is taking his reentry extremely seriously. He is affirmatively asking to spend the first six months of supervised release in a residential reentry center—a carceral environment—because he knows that he will need a lot of structure and support before he finds his own housing. And his letter to the Court is heartfelt and sincere, clearly reflecting his contrition and commitment to make better, prosocial choices—a commitment illustrated by his work in the kitchen at MDC Brooklyn and his sustained sobriety. *See* Attachment E.

A term of imprisonment greater than 60 months is unnecessary. Given the punishing time Mr. Alicea has already served and the totality of his circumstances, there is nothing a six, seven, or eight-year sentence accomplishes that will not already be achieved by a five-year sentence. Accordingly, the Court should sentence Mr. Alicea to a term of one day imprisonment on Count 1 and to 60 months' imprisonment on Count 2, followed by three years' supervised release with special conditions.

Respectfully submitted,

Andrew John Dalack, Esq.
Assistant Federal Defender, SDNY
(646) 315-1527

Cc:    AUSA Thomas John Wright